JANVIER, Judge.
This is indeed a most remarkable case. Plaintiff, a woman 53 years of age, a passenger in a taxicab which was backed into by another car which was in front of it while the cab was standing stationary, claims to have been so seriously injured that she is now a hopeless and permanent invalid, must remain constantly in bed, and suffers torture at all times. Yet the contact between the two vehicles was unquestionably of extremely slight force, in fact so slight that one of the passengers in the car which backed into the cab did not even realize that there had been contact between the two vehicles.
Plaintiff brought this suit against Joseph Catalanotto, the driver of the cab, Checker Cab Company of New Orleans, Inc., owner of the cab, John Gray who owned and drove the other car, and Hartford Accident and Indemnity Company, the liability insurer of Gray. She prayed for solidary judgment against all defendants in the sum of $31,-456.68. She later abandoned her suit insofar as it was against Catalanotto and the taxicab company, and the matter is now before us on appeal by Gray and Plartford Accident and Indemnity Company from a judgment against them in the sum of $8,-731.68.
Her list of injuries is so voluminous that we shall not at this point take the space necessary to quote it from her petition. She alleges that before the accident she had a “regular work record,” and that she “was a very vigorous person and enjoyed good health.”
The evidence was taken before a Commissioner appointed by the Judge of the Civil District Court under authority of LSA-R.S. 13:1171. Judgment was rendered in accordance with the report and recommendation of the Commissioner.
When the report of the Commissioner was filed defendants objected to it, but plaintiff filed no objection, though, on her behalf, it is now contended that the amount of the award is too low and' should be very substantially increased. Furthermore, plaintiff has not perfected her appeal, nor has she answered the appeal of defendants. She did file a motion for appeal and obtained an order granting her an appeal, but did not file a transcript, nor did she ask that the transcript which was filed by plaintiffs be considered the transcript in her appeal.
Because of her failure to object to the report of the Commissioner and because of her alleged failure to perfect her independent appeal, it is contended on behalf of defendants that under no circumstances may the judgment be increased in her favor. Whether, by failing to object to the report of the Commissioner and by failing to do more than obtain an order granting her appeal, she has lost her right to demand an increase in the amount awarded, is a question which we are not called upon to determine since we have reached the conclusion that the judgment in her favor must be reversed entirely and her suit dismissed.
We have said that this is a most remarkable case and we base this statement on the fact already referred to that the record leaves no doubt at all that the contact between the two vehicles was of such slight violence, if the word violence is appropriate at all, that the statement of Mrs. Causey that she was “barrelled” and “dashed” around in the rear seat of the taxicab is a manifest exaggeration. In fact, we consider it a masterpiece of understatement to refer to her statement as an exaggeration. Note the statement of her injuries as they appear in her petition:
1. marked limping protecting right knee, which is bandaged.
2. thoracolumbar kyphosis T1 through LI.
3. thoracolumbar scoliosis, convexity to right.
4. left paravertebral muscle spasm on erect posture, relaxes on left lateral tilt of spine.
*130 5. tenderness of all vertebral spines in lumbar region, much more marked at 5th lumbar.
6. marked limitation of lumbar spine movements in all directions.
7. exquisite tenderness cervical spines C2, C3, and C4, merely touching skin.
8. limitation of neck extension and flexion.
9. 30% of normal grip of hand on right side.
10. 30% of normal most hand and forearm muscles, right side.
11. 50% of normal arm muscles, right side.
12. 10% of normal right foot and leg muscles.
13. 70% of normal, right thigh muscles.
14. variable vibration and position sensation, right side of body.
15. variable diffust sensory changes, right upper and right lower extremity.
16. mild peroneus longus atrophy, right leg.
17. moderate swelling, right ankle.
In addition to these claims, plaintiff states that she was required to submit to an operation for hernia, that she lost several front teeth, that because of headaches she has been compelled to use a twelve pound weight in a traction arrangement on her neck, and that she is now a permanent, hopeless invalid and will never again be able to work, even if she is able to leave her bed for more than short intervals and in extreme emergencies.
Defendants admit that they would have been liable for any injuries Mrs. Causey might have sustained, but they deny that she sustained any injury, and maintain that she had suffered all her life with congenital deformities and ailments, and that for many years she had been an extreme and confirmed hypochondriac. That she had been a hypochondriac for a long time is made very evident by the reports from the hospital where her own doctors stated that she was suffering from “hypochondriasis”.
Let us now discuss the facts of the accident. The Gray car, on its way in Canal Street toward the Mississippi River, stopped at the corner of St. Charles Street because a red traffic light faced Gray. Just behind his car was the taxicab in question which was also stopped. To the rear of the taxicab and alongside both cars were many other vehicles. At that corner the street cars which are permitted to turn right off the neutral ground of Canal into St. Chaides Street, do so on a red light. A street car which should have turned could not do so because the Gray automobile had stopped partially on the curved street car track. Realizing this, Gray backed his car off the street car tracks and the taxicab also backed a few feet. As Gray backed, he removed his foot from the brake and the car rolled a very short distance farther back than he intended it should and it struck the front grill of the taxicab. Its rear bumper slipped over the front bumper of the cab in which plaintiff was a passenger.
There is no doubt at all that the impact had no semblance of violence. Mrs. Causey herself could not say just what happened. When asked: “Do you know anything about how the accident happened?” she answered: “It happened so suddenly, so quickly, I could not say and tell the truth.” She then said: “The only thing that I know that I can tell you is that I just got the worst end of the deal, that’s all.” She was asked whether she remembered “any blow of any kind to the Checker Cab,” and she answered: “All I remember was me dashing around in the back seat.” A little later, when asked whether she remembered what happened, she said: “No. All I know I was pushed around and flopped around.” And, finally, to the question: “Can you tell me *131 whether the cab was jarred hard or easy?” she answered: “That, I Can’t answer.”
When the driver of the cab asked Mrs. Causey whether she had been hurt she answered that she had not and she said: . “What is the matter with that damn fool ? He can’t drive?” Nor is it denied that when the driver asked her: “Are you all right?” she answered: “There ain’t nothing wrong with me.”
As to the force of the impact, Gray, the driver of the car which backed into the taxicab, said: “I backed up just a little bit probably two or three feet, maybe four, I really don’t think three feet at the most. I bumped the car behind me a little bit. * * * The impact was slight. It did not throw me forward at all.”
The mother of Gray who was in the car with him said that she did not feel any jolt. She added: “I did not even know we hit anything.”
Catalanotto, the driver of the cab, when asked whether he felt any impact, answered: “No, sir. There was no jolt at all, I would say.”
Joseph L’Hoste, the Safety Director of the cab company, when asked what damage had been done to the cab, said:
“Apparently none, until the driver came to the garage later in the evening and made out his accident report. Then we noticed a slight dent in the front bumper of the cab.”
He identified a photograph showing the front bumper and an examination of that photograph shows plainly that the injury to the taxicab amounted to practically nothing.
On the first examination by her own physician, Dr. Frank C. Hava, he was asked what he found and, although he said that he did find that the hernia from which she had previously suffered, was enlarged, he said: “What I found, the only thing, she complained of pain”. Arid, in spite of the fact that she claimed that several teeth had been ^o badly damaged that she had them removed later and that her mouth was full of blood at that time, Dr. Hava said: “I didn’t look into her mouth. I am not a dentist.”
Dr. Philip P. Lanasa, who examined her on the next day, says that the only thing that he found was the hernia, but that she had the associated scars, referring to the numerous scars from various operations. He was asked: “Was it your opinion that those were conditions caused by the accident?” and he answered: “No.” He was asked:
“ * * * did you detect any bruises, contusions, cuts, abrasions, brushburns, broken skin or any external evidence of injury whatsoever on Mrs. Causey’s body at the time you examined her ?”
And he answered: “No, I did not.”
There are several features about the matter which appear to us extremely significant. In the first place, Mrs. Causey would have us believe that, as alleged, before the accident she was in perfect health and had a splendid work record and had no knowledge of any physical infirmities. The truth of the matter is that there can be no doubt at all that she had congenital curvature of the spine, that she had had operations too numerous to classify — defendants say 13 and our check of the record indicates at least 11 — and that her work record was extremely spotty. Her operations had included herniotomy, hysterectomy and necrosis. We understand necrosis to be a sloughing off of the tissues which, in this case, were between the wall of the stomach and the skin. And it is shown that the necrosis in this case resulted from the fact that after one of her operations alcohol had been injected with the unfortunate result mentioned. She had had gallstones, spondy-lolisthesis and arthritis, and apparently for many years had been almost constantly under the care of surgeons and physicians. Spondylolisthesis, we are informed, and we find from Webster’s New International Dictionary, Second Edition, means: “For *132 ward displacement of a lumbar vertebra, esp. on the sacrum.” In Gray’s Attorney’s Textbook of Medicine, at page 635, spondy-lolisthesis is referred to as a condition “wherein the fifth lumbar vertebra is thrown forward upon the sacrum.”
In fact, when, as a result of the slight accident, she remained on the scene for sometime, she volunteered the statement that her doctor had instructed her to telephone him as soon as she reached home. Of course, that message had nothing to do with the accident, for, at that time, the doctor had no knowledge whatever that she was to be in an accident.
Although she says that her work record had been splendid, it was actually shown that, as a matter of fact, during the three years and three months which preceded the accident, she had worked only a fractional part of the time. In 1949, she worked ten full weeks and 23 odd days intermittently. This would mean that she worked 83 days out of 365. In 1950, she worked four full weeks and 78 odd days intermittently which would mean that in 1950 she worked 102 days of the 365. In 1951, she did not work at all, probably because of operations, and in the three months which preceded the accident on March 29th, 1952, she worked eight weeks.
It is true too that some of her doctors thought that some of her present ailments might have been due to the accident in question, but with one exception all based their conclusions almost entirely on the history which she gave them of an extremely severe crash between the two cars. She no doubt told them what she has told the Court, that she was “barrelled” and “dashed” around in the rear of the car which we have concluded is in no sense true.
Plaintiff’s statement as to her teeth is entirely unbelievable. She admits that she said nothing to the driver of the cab about injury to her mouth, nor in fact about any other injuries, and yet she says that when she reached her home she found that there was much blood in her mouth which she had not noticed earlier, and that, as a result, her dentist found it necessary to extract several of her front teeth. The dentist was not produced as a witness.
In June, which was about three months after the accident, she was again forced to submit to another operation for hernia. The surgeon who performed the operation says that before the accident she had a small hernia which was about three-quarters to an inch in length, and that this had increased in size to about twelve inches.
Another surgeon who examined her one day after the accident found no such enlarged hernia and further said that he found no undue tenderness at that spot and that whenever a hernia is either caused or enlarged by trauma there is necessarily considerable local pain. This surgeon also said that the hernia which he found was apparently not of recent origin. And he said that it was his opinion that the hernia had not been caused or increased in size by the accident.
Another surgeon, Dr. M. L. Michel, Jr., stated that trauma is not the cause of hernia to the abdominal wall and that this particular hernia was the result of many previous operations and was due to a very weak abdominal wall structure and not to this accident. Dr. Howard H. Karr was of the same opinion.
A host of expert surgeons, neurologists and orthopedists testified both for plaintiff and defendants, and we find that all of those who testified for defendants were of the opinion that the accident had had nothing to do with the deplorable, pitiable condition of plaintiff, and as we read the testimony of those who testified for plaintiff, we feel that they were of the opinion that there had been a very severe trauma and that it is on this belief that they base their respective opinions that the accident had had some causal connection with plaintiff’s present condition.
Although Mrs. Causey stated that she was required to remain almost constantly in bed, *133 all of the surgeons, with one exception, that is Dr. Blaise Salatich, expressed the opinion that she would have been in much better condition if she could have been persuaded to abandon her bed and to resume a more normal life. The Commissioner expressed the opinion that she should not have remained in bed.
Another thing that we find it hard to believe is that she was required to wear some kind of a traction collar with a twelve pound weight attached to it and that this afforded relief from her constant headaches. Dr. Howard Karr, admittedly a qualified expert neurosurgeon, said that he saw no reason for the application of this traction and when asked whether he found the condition which was said to have made the traction necessary, he said that he had found no such condition.
Dr. Karr was asked:
“Did you consider this patient gave you a fair statement of her complaints, or that she exaggerated her complaints or she underestimated her complaints?”
He answered:
“I would say that there was no correlation between this patient’s complaints and her objective findings, * * *»
and he added:
“I might add that obtaining her cooperation to get her out of bed even to be examined was carried out with a great deal of reluctance on her part, but it was accomplished.”
Dr. Robert M. Rose, another expert, expressed grave doubt as to whether Mrs. Causey had constantly been subjected to the head traction already referred to, saying:
“ * * * regarding her head, there was nothing abnormal on orthopedic examination and there was no reddening of the skin under the chin or thickening of the skin about the chin such as results from head traction even for very short periods of time.”
He was asked whether, when a patient continues in said traction, there is not some visible mark, and he answered that there undoubtedly would have been some such mark and that he found no evidences thereof. He said also that plaintiff needed; neither the head traction nor the body ■brace. Note his statement on this subject:
“ * * * it was obvious while she was at the hospital and while she was-being examined that she didn’t need the head traction that she claimed she couldn’t get along without. And when we got her up and moved her around the room in the course of the examination, it was obvious that she could move around without the body brace which she was lying in. And since there were no evident pathological changes to sustain her contention, I thought it was equally obvious that she could get around just about as well as she wanted to in relation to the way she was able to get around previous to her injury.”
Dr. O. L. Pollingue, on the question of whether or not there was necessity for traction, said that he found no necessity therefor.
It is true that there are lay witnesses who testified that prior to the accident plaintiff was in good health and that since the accident she has been able to do absolutely nothing. One of the witnesses, Mrs. Hebert, had known Mrs. Causey only during the few weeks preceding the accident. Another witness, Mrs. Keller, had seen her only a few times between the date of the accident and the trial, twenty-two months later. And although a third witness, Mrs. Boden, testified that she had worked at Dailey’s Clothing Store and at that establishment had known Mrs. Causey for the four years preceding the accident, as already shown, the record indicates that during that entire period Mrs. Causey had worked only thirty-three weeks.
Another witness, Mrs. Scanlon, stated that Mrs. Causey had been employed'for *134 twelve months each year, hut an examination of her testimony shows that she herself was only a part-time employee, and it may well he that on each occasion on which she worked at the establishment, Mrs. Causey was also there.
Reverend Miller, who stated that whenever he visited Mrs. Causey he found her in bed, no doubt was telling the truth as he knew it, but he saw her only rarely and on each of those occasions no doubt she was in bed.
One thing is certain, as we have already said, she had suffered for many years with almost every ailment to which human flesh is heir'.
It is interesting to note that the various experts expressed opinions as to the effect of pre-existing conditions from which plaintiff had suffered. For instance, Dr. Jose Garcia Oiler, one of plaintiff’s physicians, found that spondylolisthesis had existed long before the accident and that the arthritis from which plaintiff suffered was not the result of trauma. Dr. Robert M. Rose also found that the spondylolisthesis had not been caused or aggravated by the accident, and Dr. Pollingue and Dr. Oiler, and even Dr. Salatich said that both the spondylo-.lithesis and the arthritis could cause many of the complaints of plaintiff without the intervention of trauma.
It is regrettable that a plaintiff in such a condition should not be permitted to recover, but we feel that the accident on which this suit is based had nothing whatever to do with plaintiff’s present condition.
The question of whether an unsuccessful pauper plaintiff must be condemned to pay costs was considered and determined by us in an opinion handed down today on application for rehearing in Coulon v. Anthony Hamlin, Inc., La.App., 93 So.2d 557.
The judgment appealed from is annulled, avoided and reversed and plaintiff’s suit is dismissed at her cost.
Reversed.